Douglas J. Chermak (Bar No. 233382)
Email: doug@lozeaudrury.com
Michael R. Lozeau (Bar No. 142893)
Email: michael@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Telephone: (510) 836-4200

*Attorneys for Plaintiff*
CENTER FOR COMMUNITY ACTION
AND ENVIRONMENTAL JUSTICE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE, a California non-profit corporation,<br><br>Plaintiff,<br>v.<br><br>UNION PACIFIC RAILROAD COMPANY, a corporation;<br><br>Defendant. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Center for Community Action and Environmental Justice ("CCAEJ" or "Plaintiff"), a California corporation, by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331

and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.    On October 31, 2024, Plaintiff issued a 60-day Notice of Violation and Intent to Sue letter (the "Notice Letter"), attached hereto as **Exhibit A** and fully incorporated by reference herein, to Union Pacific Railroad Company ("UPRC" or "Defendant") as the owners and/or operators of UPRC's industrial facility located at 2015 S. Willow Ave., Bloomington, California 92316 ("Facility"). The Notice Letter informed Defendant of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System* ("NPDES") *General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order 2018-0028-DWQ in 2018 (effective July 1,2020*) (hereinafter, the "General Permit") and the Clean Water Act at the Facility. The Notice Letter informed Defendant of Plaintiff's intent to file suit to enforce the General Permit and the Clean Water Act.

3.    The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board (the "State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region (the "Santa Ana Regional Board" or "Regional Board"), as required by 40 C.F.R. §

135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.      Sixty (60) days have passed since the Notice Letter was sent via certified mail to Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA, USDOJ, nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6.      Plaintiff seeks relief for Defendant's substantive and procedural violations of the General Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.    INTRODUCTION

7.      This Complaint seeks relief for Defendant's unlawful discharges of pollutants into waters of the United States from its industrial operations at the Facility. Specifically, CCAEJ is informed and believes, and thereon alleges, that Defendant's discharges of pollutants from the Facility enter into channels along Slover Avenue which discharges into the Rialto Wash which discharges into Reach 4 of the Santa Ana River (collectively referred to as the "Receiving Waters"), in violation of the substantive and procedural requirements of the General Permit and the Clean Water Act. These violations have been occurring since at least January 24, 2020, and are ongoing and continuous.

8.      With every significant rainfall event, millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm

drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

## III.    PARTIES

### A.    Center for Community Action and Environmental Justice.

9.      Plaintiff CCAEJ is a non-profit public benefit corporation under the laws of the State of California with its main office in Jurupa Valley, California. CCAEJ is dedicated to working with communities to advocate for environmental justice and pollution prevention. CCAEJ and its members are deeply concerned with protecting the environment in and around their communities, including the Santa Ana River Watershed. To further these goals, CCAEJ actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

10.      CCAEJ has members living in the communities near the Facility and the Santa

Ana River Watershed. They enjoy using the Santa Ana River for recreation and other activities. Members of CCAEJ use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of CCAEJ use those areas to recreate and view wildlife, among other things. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CCAEJ's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

11. CCAEJ brings this action on behalf of its members. CCAEJ's interest in reducing Defendant's discharges of pollutants into the Santa Ana River and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CCAEJ.

12. Defendant's failure to comply with the procedural requirements of the CWA and General Permit means that CCAEJ's members are unable to obtain statutorily required information on Defendant's storm water, and storm water management practices. Thus, Plaintiff faces both informational harm and informational injury because the CWA and General Permit provide a right to information, but Defendant has often failed to provide such information, as detailed below. Further, such informational harm and injury gives Plaintiff standing on behalf of its members.

13. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or

adequate remedy at law.

**B.   Union Pacific Railroad Company.**

14.   UPRC is the current operator of the Facility, and has been the operator of the Facility since at least January 24, 2020, and is a responsible party under the Clean Water Act.

15.   CCAEJ is informed and believes, and thereon alleges, that UPRC is an active corporation.

16.   CCAEJ is informed and believes, and thereon alleges, that CT Corporation System is the registered agent for service of process for UPRC and is located at 330 N. Brand Blvd., Glendale, California 92805.

**IV.   LEGAL BACKGROUND**

**A.   The Clean Water Act.**

17.   Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

18.   The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

19.   The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

20.   The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar

dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

21.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 120.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, and wetlands adjacent to navigable waters. *Id.* In *Sackett v. Environmental Protection Agency*, the US Supreme Court constricted the EPA's interpretation of waters the United States, holding that the CWA extends to only wetlands that are "as a practical matter indistinguishable from waters of the United States." The Court then stated:

> "This requires the party asserting jurisdiction to establish "first, that the adjacent [body of water constitutes] ... 'water[s] of the United States' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins."

*Sackett v. EPA*, 598 U.S. 651, 678-679 (2023) (citing *Rapanos v. U.S.*, 547 U.S. 715, at 755, 742 (2006)).

22.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

23.    Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

24.    A third-party enforcement action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

25. Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $66,712 per day per violation for all violations. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

26. Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.    California's General Permit.**

27. Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

28. Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

29. California is a state authorized by EPA to issue NPDES permits.

30. In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

31. The General Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

32. The General Permit was issued on July 1, 2015, pursuant to Order No. 2014-0057-DWQ.

33. On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State

Board amended the General Permit to incorporate, *inter alia*, Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

34.    In order to discharge storm water to waters of the United States lawfully in California, industrial dischargers must secure coverage under the General Permit and comply with its terms, or obtain and comply with an individual NPDES permit. General Permit, Finding 12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* General Permit, Finding 17.

35.    Violations of the General Permit are violations of the Clean Water Act. *See* General Permit, § XXI(A) (Duty to Comply).

36.    The General Permit contains certain absolute prohibitions. The General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges" or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* General Permit, Discharge Prohibition III(B).

37.    The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**C.    The General Permit's Requirement for BMPs that Achieve BAT and BCT.**

38.    The General Permit Effluent Limitations require dischargers covered by the General Permit to reduce or prevent pollutants associated with industrial activity in storm

water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit, Effluent Limitation V(A). Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform.

39.    Pursuant to the CWA and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); General Permit, Effluent Limitation V(A).

40.    EPA's 2015 NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the General Permit via the Numeric Action Levels ("NALs") set forth in Table 2. *See* General Permit, § XI(B) (Monitoring, Sampling and Analysis).

41.    The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. General Permit, Effluent Limitation V(A); *See* EPA's NPDES MSGP, Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000).

42.    The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; O&G – 15 mg/L; iron – 1.0 mg/L; zinc – 0.26 mg/L; aluminum – 0.75 mg/L; and copper – 0.0332 mg/L.

43.    The General Permit establishes annual NALs and instantaneous maximum NALs.  The following annual NALs have been established under the General Permit: pH

– 6.0 – 9.0 standard units; TSS – 100 mg/L; O&G – 15 mg/L; iron – 1.0 mg/L; zinc – 0.26 mg/L; aluminum – 0.75 mg/L; and copper – 0.0332 mg/L. An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The General Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.

44.    Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks or NALs indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the Facility.

**D.    The General Permit's Storm Water Pollution Prevention Plan Requirements.**

45.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial activities. General Permit, § X(B). The SWPPP must meet all of the requirements of the General Permit. *Id.*, §§ X(A)-(H); *See also id.*, Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. *Id.*, § X(G).

46.    The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. *Id.*, § X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.*, § X(C).

47.    The SWPPP must include: a narrative description and summary of all

industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized NSWDs; the identification and elimination of NSWDs; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.*, § X.

48.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*.

49.    The General Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. *Id.*, §§ X(A)-(B). The General Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation ("Annual Evaluation") that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether

additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. *Id.*, §§ X(B), XV.

50.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. *Id.*, § X(B)(1).

**E.    The General Permit's Monitoring Requirements.**

51.    The General Permit requires permittees to develop and implement a storm water Monitoring Implementation Plan ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. *Id.*, §§ X(I), XI.

52.    The General Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the General Permit. *Id.*, §§ X(I), XI(A)-XI(D).

53.    The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See id.*, § XI.

54.    An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the General Permit. *See id*.

55.    The General Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the General Permit. *Id.*, § XI(B).

56.    Section XI(A)(1) of the General Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any NSWDs, all outdoor industrial equipment

and activities, BMPs, and all potential sources of pollution.

57.    Section XI(A)(2) of the General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

58.    Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See id.*, § XI(A)(3).

59.    The General Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. *Id.*, § XI(B)(4).

60.    Section XI(B)(1) of the General Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

61.    The General Permit requires dischargers to collect and analyze storm water samples from at least two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). *Id.*, § XI(B)(3).

62.    Storm water samples must be analyzed for, *inter alia*, TSS, pH, O&G, additional parameters identified on a facility-specific basis that serves as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, and those required under a facility's Standard Industrial Classification ("SIC") code. *Id.*, § XI(B)(6).

63.    General Permit Section XI(B)(6)(e) requires that industrial dischargers

analyze discharges for "additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix [portion of assessment of pollutant sources related to potential of aforementioned pollutions to be causing or contributing to applicable WQS]."

64.    Section XI(B)(11) of the General Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via the Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

### F.    The General Permit's Annual Reporting Requirements.

65.    Section XVI of the General Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

66.    The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the applicable requirements of the General Permit, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *See id.*, § XVI.

67.    Annual Reports are certified by the legally responsible person under penalty of perjury.

## V.    FACTUAL BACKGROUND

### A.    The Facility's General Permit Coverage.

68.    Plaintiff alleges that UPRC has obtained General Permit coverage for the Facility since at least June 19, 2015, by submitting an NOI to the State Board.

69.    The Facility's NOI identifies the operator of the Facility as Union Pacific

Railroad with an address of 1400 Douglas Street, Omaha, NE 68179.

70.    The Facility's NOI lists the Facility size as 34 acres, with 25 acres of industrial area exposed to storm water.

71.    The Facility's NOI indicates that 15% of the Facility, including rooftops, is impervious.

72.    Per the Facility SWPPP, the Facility's operating hours 24 hours, 7 days per week.

73.    The State Board's electronic SMARTS database lists the current Facility Waste Discharge Identification ("WDID") number as 8 36I004753.

74.    SMARTS lists the Facility's coverage under the General Permit as "Active."

75.    The NOI lists the SIC code for the Facility as 4011.

76.    The Facility must obtain General Permit coverage for the entire Facility. *See id.*, § XVII(E)(1).

77.    Plaintiff is informed and believes, and thereon alleges, that the Defendant is required to sample storm water for TSS, pH, O&G, iron, zinc, aluminum, and copper.

**B.    Industrial Activities and Pollutant Sources at the Facility.**

78.    Plaintiff is informed and believes, and thereon alleges, that the Facility serves as a locomotive and railcar service and repair facility.

79.    Plaintiff alleges that the industrial processes that occur at the Facility include, but are not limited to, the following: material storage and handling, locomotive repair and servicing, locomotive washing, off road vehicle fueling/servicing/cleaning, fixed fueling, direct to locomotive fueling, heavy railcar repair, and light railcar repair.

80.    Plaintiff is informed and believes, and thereon alleges, that industrial activities occur both indoors and outdoors at the Facility.

Complaint                                    16

81.    Plaintiff is informed and believes, and thereon alleges, that pollutants have been and continue to be tracked throughout the Facility by vehicles and machinery, including forklifts, which are tracked to areas of exposure, and then conveyed by storm water flows outside of the Facility.

82.    Plaintiff is informed and believes, and thereon alleges, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

83.    Plaintiff alleges that Defendant has not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

84.    BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

85.    Plaintiff is informed and believes, and thereon alleges, Defendant's failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility into the Receiving Waters in violation of the General Permit and the Clean Water Act.

86.    Plaintiff is informed and believes, and thereon alleges, that these illegal discharges of polluted storm water negatively impact Plaintiff's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

### C.    The Facility's Storm Water Sampling Points and Discharges to the Receiving Waters.

87.    Plaintiff alleges that the Facility collects and discharges storm water from its

industrial site through at least three discharge locations.

88.     Plaintiff alleges that the discharge locations at the Facility contain storm water that is commingled with runoff from the Facility from areas where industrial processes occur.

89.     Plaintiff alleges that storm water discharges from the Facility flow into channels alongside Slover Avenue that discharge into the Rialto Wash which flows into Reach 4 of the Santa Ana River.

90.     Plaintiff alleges that the Rialto Wash and the Santa Ana River are waters of the United States.

### D.     Defendant's Violations of the General Permit's Requirement for BMPs that Achieve BAT and BCT.

91.     Plaintiff is informed and believes, and thereon alleges, that Defendant has not implemented BMPs that achieve BAT/BCT at the Facility.

92.     Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above EPA Benchmarks incorporated into the General Permit as NALs.

93.     Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants with exceedances of annual NALs.

94.     The levels of zinc in storm water detected by the Facility have exceeded the EPA Benchmark and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively. For example, on November 8, 2022, UPRC measured a level of zinc of 1.0 mg/L from storm water discharged from one of the Facility's outfalls. That level of zinc is almost four times the EPA Benchmark and annual NAL for zinc. UPRC also has measured levels of zinc in storm water discharged from the Facility in excess of 0.26 mg/L

on the following dates: December 29, 2020; March 11, 2021; December 16, 2021; March 29, 2022; December 12, 2022; December 21, 2023; January 3, 2024; and January 27, 2025.

95.    The levels of TSS in storm water detected by the Facility have exceeded the EPA Benchmark and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively. For example, on November 16, 2023, UPRC measured a level of TSS of 612 mg/L from storm water discharged from one of the Facility's outfalls. That level of zinc is over six times the EPA Benchmark and annual NAL for TSS. UPRC also has measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L on the following dates: December 29, 2020; January 29, 2021; March 11, 2021; December 16, 2021; March 29, 2022; November 8, 2022; November 16, 2023; January 3, 2024; and January 27, 2025.

96.    The levels of iron in storm water detected by the Facility have exceeded the EPA Benchmark and annual NAL for iron of 1.0 mg/L established by EPA and the State Board, respectively. For example, on January 3, 2024, UPRC measured a level of iron of 16.2 mg/L from storm water discharged from one of the Facility's outfalls. That level of iron is over 16 times the EPA Benchmark and annual NAL for iron. UPRC also has measured levels of iron in storm water discharged from the Facility in excess of 1.0 mg/L on the following dates: December 29, 2020; January 27, 2021; January 29, 2021; March 11, 2021; December 16, 2021; March 29, 2022; November 8, 2022; December 12, 2022; November 16, 2023; December 21, 2023; April 1, 2024; and January 27, 2025.

97.    The levels of aluminum in storm water detected by the Facility have exceeded the EPA Benchmark and annual NAL for aluminum of 0.75 mg/L established by EPA and the State Board, respectively. For example, on January 3, 2024, UPRC measured a level of aluminum of 12.1 mg/L from storm water discharged from one of the Facility's outfalls.

That level of aluminum is over 16 times the EPA Benchmark and annual NAL for aluminum. UPRC also has measured levels of aluminum in storm water discharged from the Facility in excess of 0.75 mg/L on the following dates: December 29, 2020; January 27, 2021; January 29, 2021; March 11, 2021; December 16, 2021; March 29, 2022; November 8, 2022; December 12, 2022; November 16, 2023; December 21, 2023; April 1, 2024; and January 27, 2025.

98.    The levels of copper in storm water detected by the Facility have exceeded the EPA Benchmark and annual NAL for aluminum of 0.0332 mg/L established by EPA and the State Board, respectively. For example, on January 3, 2024, UPRC measured a level of copper of 0.065 mg/L from storm water discharged from one of the Facility's outfalls. That level of copper is almost twice times the EPA Benchmark and annual NAL for copper. UPRC also has measured levels of copper in storm water discharged from the Facility in excess of 0.0332 mg/L on the following dates: December 29, 2020; January 27, 2021; January 29, 2021; March 11, 2021; December 16, 2021; March 29, 2022; November 8, 2022; December 12, 2022; November 16, 2023; December 21, 2023; and January 27, 2025.

99.    Plaintiff alleges that the Facility's ongoing discharges of storm water with pollutants in excess of applicable NALs and EPA Benchmarks demonstrate that the Defendant has failed and continue to fail to develop and/or implement BMPs that comply with the General Permit's BAT/BCT standards.

100.    Each day that Defendant has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of the Clean Water Act.

101.    The Defendant has been in violation of the BAT and BCT requirements at

the Facility every day since at least January 24, 2020.

**E.  Defendant's Violations of the General Permit's Storm Water Pollution Prevention Plan Requirements.**

102.  The Facility's SWPPP is publicly available via the SMARTS database and is dated September 18, 2020.

103.  Plaintiff is informed and believes, and thereon alleges that the SWPPP referenced in Paragraph 102 is the current SWPPP for the Facility.

104.  Plaintiff is informed and believes, and thereon alleges that Defendant has failed and continue to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of the SWPPP requirements of the General Permit.

105.  Plaintiff alleges that the SWPPP fails to include detailed information about the Facility's Pollution Prevention Team. General Permit, § X(D)(1).

106.  Plaintiff alleges that the SWPPP site maps fail to identify all storm water drainage areas within the Facility boundary. General Permit, § X(E)(3)(a).

107.  Plaintiff alleges that the SWPPP site maps fail to show the locations of municipal storm drain inlets that may receive the Facility's industrial storm water discharges and authorized NSWDs. *Id*, § X(E)(3)(a).

108.  Plaintiff alleges that the SWPPP fails to include a list of industrial materials handled at the Facility, and the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling. *Id*., § X(F).

109.  Plaintiff alleges that the SWPPP fails to include the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. *Id*., § X(G)(1)(a).

110.  Plaintiff alleges that with respect to material handling and storage areas, the

SWPPP fails to include the type, characteristics, and quantity of industrial materials handled or stored; the shipping, receiving, and loading procedures; the spill or leak prevention and response procedures; and the areas protected by containment structures and the corresponding containment capacity. *Id*., § X(G)(1)(b).

111.   Plaintiff alleges that the SWPPP fails to include an assessment of potential pollutant sources. *Id*., § X(G)(2).

112.   Plaintiff alleges that the SWPPP fails to identify any areas of the Facility where the minimum BMPs will not adequately reduce or prevent pollutants in storm water discharges in compliance with Section V.A of the General Permit. *Id*., § X(G)(2)(b).

113.    Plaintiff alleges that the SWPPP fails to implement required advanced BMPs in compliance with Section X(H) of the General Permit. Plaintiff alleges that the SWPPP fails to identify and justify each minimum BMP or applicable BMP not being implemented at the Facility because they do not reflect best industry practice considering BAT/BCT. *Id*., § X(H)(4)(b).

114.    Plaintiff is informed and believes, and thereon alleges that Defendant has failed to adequately develop, implement, and/or revise a SWPPP in violation of Section X of the General Permit in response to ongoing high concentrations of pollutants and consistent exceedances of applicable NALs.

115.   Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the General Permit and the Clean Water Act.

116.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in daily and continuous violation of the General Permit's SWPPP requirements since at least September 18, 2020.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**F.     Defendant's Violations of the General Permit's Monitoring Requirements.**

117.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

118.   Precipitation data obtained from the National Oceanic and Atmospheric Administration demonstrates that there were numerous QSEs at the Facility during the past several Reporting Years that Defendant failed to monitor.

119.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continue to fail to collect and analyze storm water discharge samples from all QSEs at the Facility as required by Section XI(B)(2) of the General Permit as follows:

- Failure to collect and analyze a sample from outfall SW-06A during the second half of the 2019-2020 reporting year.

- Failure to collect and analyze a second sample from all outfalls during the first half of the 2021-2022 reporting year.

- Failure to collect and analyze a second sample from all outfalls during the second half of the 2021-2022 reporting year.

- Failure to collect a second sample from outfall SW-06A during the second half of the 2023-2024 reporting year.

120.   Plaintiff is informed and believes, and thereon alleges, that the storm water samples that Techno West collected on the following dates were not from QSEs: March 11, 2020; April 8, 2020; December 29, 2020; January 27, 2021; January 29, 2021; March 11, 2021; December 16, 2021; December 12, 2022; January 11, 2023; January 16, 2023; and April 1, 2024. Plaintiff thereon alleges that Defendant has failed and continue to fail to collect and analyze storm water samples from the respective periods as follows:

- Failure to collect and analyze two samples from all outfalls during the second half of the 2019-2020 reporting year.

- Failure to collect and analyze an initial sample from all outfalls during the first half of the 2020-2021 reporting year.

- Failure to collect and analyze two samples from all outfalls during the second half of the 2020-2021 reporting year.

- Failure to collect and analyze an initial sample from all outfalls during the first half of the 2021-2022 reporting year.

- Failure to collect and analyze a second sample from all outfalls during the first half of the 2022-2023 reporting year.

- Failure to collect and analyze two samples from all outfalls during the second half of the 2022-2023 reporting year.

- Failure to collect and analyze a second sample from all outfalls during the first half of the 2023-2024 reporting year.

121.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in daily and continuous violation of the General Permit's MIP and monitoring requirements since at least January 24, 2020.

122.   Plaintiff is informed and believes, and thereon alleges, that the Defendant is in violation of the General Permit and the Clean Water Act because they have failed and continue to fail to adequately develop, implement, and/or revise its MIP in violation of the General Permit's MIP requirements.

123.   Every day that Defendant operates with an inadequately developed, revised, and/or implemented MIP is a separate and distinct violation of the General Permit and the Clean Water Act.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violations of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the General Permit's Requirement for BMPs that Achieve BAT and BCT.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

124.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

125.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT in violation of Effluent Limitation V(A) of the General Permit and the Clean Water Act, 33 U.S.C. § 1311(b). Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the General Permit and the CWA. General Permit, Effluent Limitation V(A); 33 U.S.C. § 1311(b).

126.    Each day since January 24, 2020, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

127.   Defendant has been in violation of the BAT/BCT requirements every day since January 24, 2020. Defendant continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

///

///

## SECOND CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the General Permit.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

128.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

129.    Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant has failed and continue to fail to develop, implement, and/or revise an adequate SWPPP for the Facility, in violation of the General Permit.

130.    Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

131.    Each day since September 18, 2020, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

132.    Defendant has been in violation of the General Permit's SWPPP requirements every day since September 18, 2020. Defendant continues to be in violation of the SWPPP requirements each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

## THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan and Perform Required Monitoring in Violation of the General Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

133.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

134.    Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant has failed and continue to fail to develop, implement,

and/or revise an adequate MIP and monitoring program for the Facility, in violation of the General Permit.

135. Defendant's ongoing failure to develop, implement, and/or revise an adequate MIP and monitoring program is evidenced by, *inter alia*, Defendant's failure to collect and analyze samples from all required QSEs.

136. Defendant has been in violation of the General Permit monitoring requirements at the Facility every day from January 24, 2020, to the present.

137. Defendant will continue to be in violation of Sections X(I) and XI of the General Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise the MIP for the Facility.

138. Each day since at least January 24, 2020, that Defendant has failed to develop, implement and/or revise an adequate MIP and monitoring program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Clean Water Act.

**<u>RELIEF REQUESTED</u>**

WHEREFORE, Plaintiff prays judgment against Defendant as set forth hereafter and respectfully requests that this Court grant the following relief:

    a. Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

    b. Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

    c. Enjoin Defendant from further violating the substantive and procedural

Complaint       27

requirements of the General Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to comply with the MIP requirements of the General Permit, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendant to prepare a SWPPP for the Facility consistent with the requirements of the General Permit and implement procedures to regularly review and update the SWPPP;

g.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Clean Water Act and the Court's orders;

h.   Order Defendant to pay civil penalties of up to $66,712 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1-19.4;

i.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

///

///

///

///

Complaint                                    28

k.   Award any such other and further relief as this Court may deem appropriate.

Dated: March 25, 2025                Respectfully submitted,


_____/s/ *Douglas J. Chermak*_____
Douglas J. Chermak
Attorneys for Plaintiff
Lozeau Drury LLP